# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN W. OUGHTRED, Individually And On Behalf Of All Others Similarly Situated )<br><br>Plaintiff, )<br><br>v. )<br><br>E*TRADE FINANCIAL CORPORATION & E*TRADE SECURITIES LLC, )<br><br>Defendants. ) | Case No. 1:08-CV-3295 (SHS)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |



153081

1.      Lead Plaintiffs Roger Bresnahan and Srinivasan Murari, by their counsel, allege the following based upon personal knowledge as to their own acts and upon the investigation of by their counsel, which includes, among other things, a review of:  (a) public statements, sales presentations and marketing materials by E*Trade Financial Corporation ("E*Trade Financial") and E*Trade Securities LLC ("E*Trade") (collectively "Defendants"), and their affiliates, agents and employees; (b) Securities and Exchange Commission ("SEC") filings made by Defendants and other brokerages, financial services firms and investment companies; (c) public filings and statements in court proceedings and civil government and regulatory investigations involving Defendants and other brokerages, financial services firms and investment companies; (d) documents believed to be authentic copies of internal documents and other business records of various brokerages, financial services firms and investment companies obtained from public record sources; (e) securities analysts' reports, press releases and media reports; (f) interviews with purchasers of auction rate securities and other knowledgeable individuals; (g) interviews with former employees and financial advisors of Defendants; and (h) discussions with consultants.

## INTRODUCTION

2.      This is a class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of all persons or entities who purchased auction rate securities from E*Trade between April 2, 2003 and February 13, 2008, inclusive ("Class Period"), and who were damaged thereby.

3.      During the Class Period, E*Trade sold auction rate securities ("ARS") to its clients as highly liquid, money market-like, short-term investments.

4.      These representations were false at the time they were made and E*Trade knew, or was reckless in not knowing, that auction rate securities were not equivalent to cash.  By no later than March 2005, the SEC and the "Big-4" accounting firms had already determined that auction rate securities do not quality as cash equivalents.

1

5.     E*Trade further told clients that the ARS market "continues to experience tremendous growth" and that E*Trade would help clients participate in the "accelerated supply and demand" for ARS.

6.     E*Trade, however, knew or was reckless in not knowing that ARS auctions were failing as early as August 2007, further proof that auction rate securities were in no way similar to cash or money market accounts and that demand for ARS was sharply on the decline.

7.     Despite E*Trade's knowledge that its representations were misleading and omitted material information, E*Trade engaged in a scheme to defraud purchasers of auction rate securities by making omissions and misrepresentations of material fact about the risks, value and liquidity of those securities.

8.     On February 13, 2008, the auction rate securities market collapsed after all major auction rate securities broker-dealers abruptly ended their policy of propping up the market, leaving Class Members holding hundreds of millions of dollars in illiquid auction rate securities, often earning interest far below market rates.

9.     As of February 19, 2010, more than two years after the collapse of the auction rate securities market, Defendants admit that their customers continue to hold approximately $169.7 million in illiquid auction rate securities.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5).

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§ 1391(b) and 1337.  Defendants maintain offices within this District and many of the acts giving rise to the violations complained of herein took place in this District.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

13.     Lead Plaintiff Roger Bresnahan, as set forth in his previously-filed certification incorporated by reference herein, purchased auction rate securities sold by E*Trade during the Class Period and was damaged thereby. Although some of Mr. Bresnahan's ARS have been redeemed by the issuers, Mr. Bresnahan continues to hold illiquid ARS sold by E*Trade. Defendants have never redeemed or repurchased any of the ARS they sold to Mr. Bresnahan. Despite Mr. Bresnahan's repeated attempts, he has been unable to sell the ARS he purchased from E*Trade at par value.

14.     Lead Plaintiff Srinivasan Murari, as set forth in his previously-filed certification incorporated by reference herein, purchased auction rate securities sold by E*Trade during the Class Period and was damaged thereby. Although some of Mr. Murari's ARS have been redeemed by the issuers, Mr. Murari continues to hold illiquid ARS sold by E*Trade. Defendants have never redeemed or repurchased any of the ARS they sold to Mr. Murari. Despite Mr. Murari's repeated attempts, he has been unable to sell the ARS he purchased from E*Trade at par value.

15.     Defendant E*Trade Financial Corporation ("E*Trade Financial") is a Delaware corporation headquartered in New York, New York. E*Trade Financial Corporation is a leading financial firm and conducts its brokerage business through its subsidiary E*Trade Securities LLC. In its Press Releases, E*Trade Financial states: "The E*TRADE FINANCIAL family of companies provides financial services including trading, investing and banking for retail and institutional customers. Securities products and services are offered by E*TRADE Securities LLC."

3

16.     Defendant E*Trade Securities LLC ("E*Trade") is a Delaware corporation with its principal executive offices located in New York, New York.  E*Trade Securities LLC, a wholly-owned subsidiary of E*Trade Financial Corporation, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the Financial Industry Regulatory Authority ("FINRA").  In E*Trade Financial's 10-K for 2008, E*Trade Financial states: "E*TRADE Securities LLC is a registered broker-dealer and the primary provider of brokerage services to our customers."

**CLASS ACTION ALLEGATIONS**

17.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), (b)(2) and/or (b)(3), and 23(c)(4) on behalf of a Class consisting of all persons and entities that purchased auction rate securities from E*Trade between April 2, 2003, and February 13, 2008, inclusive, and were damaged thereby (the "Class").

18.     Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, employee or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable.  The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States.

20.     During the Class Period, E*Trade sold auction rate securities to thousands of customers.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members of the proposed Class.

21.     Record owners and other members of the Class may be identified from records maintained by Defendants and other brokerage firms and may be notified of the pendency of this

4

action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

     b.     Whether Defendants made omissions or misrepresentations of material fact about the risks, value and liquidity of auction rate securities and the market for such securities; and

     c.     Whether Class members have sustained damages and the proper measure of damages.

23.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

24.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of Lead Plaintiffs' claims.  The damages suffered by individual Class members are relatively small given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class to individually redress the wrongs done to them.

26.     Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class.

27.    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1), 23(b)(2) and/or 23(c)(4) because:

a.    The prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

d.    The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## FACTUAL ALLEGATIONS

**A.    Background**

**i.    Auction Rate Securities**

28.    Auction rate securities are long-term or perpetual variable-rate equity or debt instruments that paid interest or dividends at rates set at periodic "auctions."

29.    Auction rate securities are issued by closed-end preferred funds ("auction rate preferreds"); states, state agencies, municipalities, or other governmental authorities ("municipal auction rate securities"); public or private student loan originators and lenders ("SLARS"); and other corporations and entities' collateralized debt obligations ("CDO auction rate securities"). CDO auction rate securities represented as much as 6% of the total ARS market.

30.    The market for auction rate securities experienced dramatic growth since the securities were first introduced in 1984. At the end of 2005, approximately $263 billion of auction rate securities were outstanding. In the subsequent 26 months, the auction rate securities market grew by nearly 25 percent. By February 2008, the market for auction rate securities exceeded $330 billion.

31.     When auction rate securities were first introduced in the mid-1980s, they were offered only to highly sophisticated, institutional investors with required minimum purchases of $250,000 or more.  Prior to the beginning of the Class Period, issuers and underwriters lowered the minimum investment to $25,000.  The reduced minimum investment enabled sellers to market auction rate securities to retail investors, including individuals, charities, and small businesses.

### ii.     The Auction Process

32.     Prior to February 2008, auction rate securities typically traded at par value through periodic "Dutch" auctions generally held every 7, 28, 35, or 49 days.  The auctions determined which investors would own the securities as well as the "clearing rate," the rate of interest or dividends paid on those securities until the next periodic auction.  Auction procedures typically allowed participants to submit orders to buy, sell, or hold auction rate securities.

33.     Auction rate securities allowed issuers to obtain long-term financing at less expensive, short-term rates.  Auction rate securities purchasers were willing to accept short-term rates because they reasonably believed that auction rate securities could readily be disposed of at par through the periodic auctions.

34.     Issuers of auction rate securities selected and paid firms to act as the dealer through which investors submitted orders at auctions for the issuers' securities.  The firm selected to receive bids was referred to as an "auction dealer," "broker-dealer," or "auction manager."  The term "auction dealer," as used in this Complaint, is synonymous with the terms "broker-dealer" and "auction manager."  Investors also could place orders at auctions through other designated brokerages, often referred to as "remarketing agents" or "distributing firms," which then would transmit those orders to the auction dealer.  The firm that underwrote an issuance of auction rate securities typically served as auction dealer for those securities.

35.     In a successful auction, the number of shares bid for purchase at a particular rate was equal to or greater than the number of shares offered for sale at that rate.  All shares for sale were purchased, and the clearing rate, i.e., the lowest interest or dividend rate at which all sale

7

orders could be fulfilled, applied to all securities sold until the next auction. An auction failed if the number of shares offered for sale exceeded the number of shares bid for purchase.

36.     If the auction failed, then none of the current holders could sell their shares, as auction rate securities have no "put" feature guaranteeing that an investor can either sell the securities back to the auction dealer on demand at par value or force the issuer to redeem the securities. If an auction failed, however, the holder of an auction rate security was entitled to collect dividends or interest at a predetermined rate until the next auction. The predetermined rate of interest that was paid in the event of a failed auction was typically referred to as the "maximum rate."

37.     The maximum rate was supposed to ensure that the auction rate security remained liquid if the auction failed, by attracting new buyers or prompting the issuer to refinance. If the maximum rate was insufficient to attract liquidity in the event of an auction failure, however, the risk characteristics of the auction rate security were fundamentally altered. An auction rate security that carried a low maximum rate was entirely dependent on the auction dealer's intervention and "support" for the periodic auctions to ensure liquidity, and in the absence of the auction dealer's support (i.e., willingness to serve as a buyer of last resort to prevent the auction from failing), any auction failure would render the security illiquid, as the maximum rate could not be counted on to attract new buyers or prompt the issuer to refinance.

38.     As the market for auction rate securities became increasingly saturated, in order to satisfy the demands of issuers and obtain the high credit ratings needed to sell the securities, auction dealers underwrote and sold more and more auction rate securities with maximum rates that were capped at insufficient levels to attract liquidity in the event of an auction failure.

**B.**   <u>Auction Dealers Manipulated The Market For Auction Rate Securities</u>

   **i.**   <u>By Routinely Intervening In The Auctions, Auction Dealers Created A Façade Of Liquidity</u>

   39.   Throughout the Class Period, to mask the inherent lack of liquidity of auction rate securities, auction dealers engaged in a wide range of tactics to conceal the liquidity characteristics of auction rate securities from purchasers like Class Members

   40.   The SEC has confirmed that throughout the Class Period, auction dealers used their own capital to place "support bids" in the auctions. Through the placement of these support bids, auction dealers purchased auction rate securities for their own account when the auctions otherwise would have failed due to a lack of sufficient demand.

   41.   Until August 2007, auction dealers followed uniform policies of placing support bids in auctions as necessary to prevent auction failures. In August 2007, some auction dealers stopped placing support bids in a limited number of auctions for ARS, including auctions for CDO auction rate securities, allowing those auctions to fail. While these failures were not widely known to the investing public, these failures were known to companies involved in the auction rate securities market.

   42.   For example, after January 1, 2006, auction dealer UBS placed support bids in more than 30,000 auctions of municipal and student loan auction rate securities, preventing more than 85 percent of those auctions from failing. During the same time period, UBS placed support bids in more than 27,000 auctions of auction rate preferred securities, preventing more than 50 percent of those auctions from failing. After January 3, 2006, auction dealer Merrill Lynch placed support bids that prevented more than 5,800 auctions from failing.

   43.   During the Class Period, auction dealers, including Citigroup, Wachovia, Bank of America, Raymond James and Royal Bank of Canada, similarly placed support bids in auctions for which they were the sole or lead auction dealers as necessary to prevent the auctions from failing.

44.     Auction dealers continued to intervene in the auctions to prevent wide-spread failures until around February 13, 2008.

45.     Auction dealers were able to place support bids and prevent auctions from failing because they were aware of the other bids in the auctions and could place their own bids after the bidding deadline for other investors.

46.     The extensive and sustained interventions by auction dealers to prevent auction failures created the outward appearance that auction rate securities were readily liquid investments.

47.     By intervening to prevent auction failures, auction dealers masked the liquidity risks inherent in auction rate securities and the fact that supply vastly exceeded the demand for these securities.  Due to the lack of transparency in the auction market, investors had no way of knowing the extent to which auction dealers' interventions were needed to sustain the auction rate market and ensure that auctions continued to clear.

48.     Had auction dealers not supported these auctions, widespread auction failures would have alerted the public to the risk characteristics of the auction rate securities.

ii.     **Auction Dealers Routinely Intervened In The Auctions To Set The Rates Of Interest Paid On Auction Rate Securities**

49.     Throughout the Class Period, auction dealers set the clearing rates for the auctions that would have failed but for their support bids.  For each auction, auction dealers knew all the bids that had been placed by both holders and prospective buyers of the securities.  Armed with this information, auction dealers placed buy bids at specified rates and in sufficient amounts that ensured the auctions would clear at those rates.

50.     By intervening in the auctions, auction dealers set the clearing rates but also added auction rate securities to their own inventories.  Auction dealers and their distributing firms, then reduced the excess inventory between auction periods by selling auction rate securities at the previously established clearing rates.

51.     Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of higher risk, interventions to manage interest rates and suppress auction failures deprived investors of objective information they needed to evaluate the true risk characteristics of auction rate securities.

### iii.     The Auction Rate Securities Market Collapses

52.     On or around February 13, 2008, all major auction dealers refused to continue to support the auctions.  As a result, 87 percent of all auctions failed.

53.     As a result of the withdrawal of support by the major auction dealers, the market for auction rate securities collapsed, rendering more than $300 billion of securities illiquid.

### C.     During the Class Period, E*Trade Knew Or Was Reckless In Not Knowing That The Auction Rate Securities Were Not Cash-Equivalents.

54.     E*Trade holds itself out as an expert in all of the financial products its sells.  As E*Trade promises on its website: "Who do you call when you need help with your investing? Our experienced investment professionals can help you create a plan, choose investments, manage risk, and much more. You'll get objective, no–nonsense advice you can rely on."  As E*Trade again promises on its website, "at E*Trade you'll never have to 'go it alone.'"

55.     E*Trade was actively involved in the auction rate securities market throughout the Class Period.

56.     E*Trade acted as a remarketing agent for auction rate securities and sold hundreds of millions of dollars worth of auction rate securities to its clients throughout the Class Period.

57.     Unlike E*Trade's advertised, do-it-yourself trading platform, whereby customers could process their own buy and sell orders in a self-directed manner, an ARS purchase from E*Trade required the involvement of an E*Trade financial advisor.  Therefore, most if not all of E*Trade's customers who purchased ARS spoke with an E*Trade financial advisor prior to the purchase.

58.     By virtue of its substantial participation in the auction rate securities market and its claimed expertise in the products it sells, E*Trade knew or was reckless in not knowing the

11

liquidity features and risk characteristics of ARS.  Among other things, E*Trade knew or was reckless in not knowing that auction rate securities were not liquid cash equivalents, but were long-term equity or debt securities.

59.     Since at least March 2005, E*Trade has known or was reckless in not knowing that the "Big-4" accounting firms, the Financial Accounting Standards Board ("FASB") and the SEC have adopted the position that auction rate securities do not qualify as "cash equivalents." According to the SEC, "because the auction rate securities have long-term maturity dates and there is no guarantee the holder will be able to liquidate its holdings, these securities do not meet the definition of cash equivalents in paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows*."

60.     Therefore, beginning no later than March 2005, E*Trade knew, was reckless in not knowing or had access to information from the SEC clearly stating that ARS are not cash-equivalents like money market accounts and should not be described as short-term investments.

**D.     During the Class Period, E*Trade Knew That The Auction Rate Market Was Unstable And On The Brink Of Collapse.**

61.     In addition to knowing that ARS were not cash-equivalents, E*Trade knew that the foundations for the ARS market were collapsing long before the mass failure of the ARS market in February 2008.

62.     In an earnings call on October 17, 2007, E*Trade discussed its troubling financial performance in the Third Quarter of 2007.  During the call, Mitchell Caplan ("Caplan"), Chief Executive Officer of E*Trade Financial, stated that "the credit markets experienced unprecedented disruptions during the third quarter, creating an extremely challenging environment.  The volatility in the credit markets, declining home prices, and the repricing of risks drove wider credit spreads.  This led to increased default rates, losses and reduced liquidity across mortgage-related assets throughout the industry."  Caplan stressed that all of E*Trade's financials were "overshadowed by volatility in the credit markets."

12

63.     In this same earning call, Caplan stressed that Defendants' losses "were primarily related to two categories within our asset-backed security portfolio, which we identified to have the highest risk.  Specifically, these were collateralized debt obligations, or CDOs, and securities collateralized by second lien mortgages."  Caplan also stated in this same call that E*Trade Financial would be "writing down securities rated lower than AA by more than an average of $.50 on the dollar."  E*Trade Financial even admitted that it "felt extremely uncomfortable obviously with our AAAs . . ."

64.     Caplan further forecasted that the "fix[ed] income market [would continue] to be incredibly challenging."

65.     After discussing its losses in the Third Quarter, Caplan and Jarrett Lilien ("Lilien"), Chief Operating Officer for E*Trade Financial, both emphasized the importance of E*Trade's customers continuing to maintain cash deposits, including in assets like ARS that E*Trade classified as cash, in their E*Trade accounts.

66.     Caplan stated during this same earnings call: "What we've seen I think were some very encouraging things with our customer behavior.  First of all was seeing that they are actually net buyers in the quarter.  So they were putting more money into the market and they were also out there putting more money into their accounts."  Lilien added: "These positive customer metrics . . . are particularly important this quarter given the disruption in the credit markets and **the impact that this has on the perceived stability of our business**. . . . We continue to see success in attracting new accounts, as well as deepening engagement with existing accounts to increase share of wallet." (emphasis added).

67.     Robert Simmons, Chief Financial Officer for E*Trade Financial, even stressed in this same earnings call that 70% to 80% of this increase in cash deposits was from E*Trade's "brokerage customers."

68.     In a November 9, 2007 Press Release, E*Trade Financial announced that it was downgrading $50 million of AAA rated asset-backed CDOs on its books to below investment grade.  E*Trade Financial was so uncertain about the future of the financial market that it refused

13

to predict future results for the company. In this same Press Release, E*Trade Financial stated: "Actual securities-related losses will depend on future market developments, **including the potential for future downgrades by rating agencies,** which are extremely difficult to predict in this environment. Accordingly, management believes that it is no longer beneficial to provide earnings expectations for the remainder of the year." (emphasis added).

69.     Despite this specific knowledge of the increasing turmoil in the credit markets, E*Trade never provided its customers with any information or warnings regarding the similar risk of continuing to own or continuing to purchase ARS generally and CDO auction rate securities specifically.

70.     Moreover, despite internally downgrading its own AAA-rated investments, E*Trade never warned its customers that AAA-rated ARS, including CDO auction rate securities, were similarly over-rated.

71.     Instead of providing their customers with any disclosures regarding E*Trade's specific knowledge of the increasing turmoil in the very markets on which many ARS were based, E*Trade continued to sell ARS, including CDO auction rate securities, to its customers as short-term, cash-like investments.

72.     Because of Defendants' substantial losses in its other lines of business, Defendants needed to manufacture the "perceived stability" of its business by significantly increasing the cash deposits from its clients. Defendants accomplished this goal by misleading clients into believing that ARS were safe, short-term investments that carried no more risk than a money market account.

**E.**     **During The Class Period, E*Trade Aggressively Marketed ARS By Misrepresenting And Omitting Material Facts About The Auction Market And The Liquidity Of And Risks Associated With Auction Rate Securities**

73.     E*Trade's financial instability in the last six month of 2007 resulted in an increasing number of worried calls from E*Trade customers, who were concerned about E*Trade's viability and the security of money invested at E*Trade.

14

74.     In response to these concerns and in an attempt to halt the outflow of money from concerned customers, E*Trade began aggressively marketing auction rate securities to its clients.

75.     In Summer 2007, E*Trade emailed its existing customers encouraging them to purchase ARS.  "The **ARS market continues to experience tremendous growth** and our electronic trading platform will further fulfill **accelerated supply and demand** for this currently under-serviced asset class." (emphasis added).

76.     Separately, BondDesk Group, a company that provided software and trading platforms to companies including E*Trade, issued a Press Release on or about June 7, 2007 stating that "E*Trade Securities LLC will be the first financial services firm to offer electronically traded ARS to retail investors."  This same Press Release about E*Trade further stated: "**Auction Rate Securities** have attracted the attention of investors because they **are short-term instruments that generally produce higher rates of return than traditional money market investments.**"

77.     In a continuing effort to mask E*Trade and E*Trade Financials' failing balance sheets, E*Trade began an even stronger marketing campaign designed to sell ARS to its clients in late 2007.

78.     In a December 21, 2007 Press Release, E*Trade Financial announced "an aggressive customer win-back campaign, one component of its comprehensive turnaround plan. . . . The customer win-back campaign, which began earlier this month, incorporates targeted engagement incentives and outreach initiatives to current and prospective customers alike."

79.     As part of this "Win-Back Campaign," E*Trade placed ads both on television, which included the "talking baby" Super Bowl ads, as well as ads on websites and in newspapers.  In playing on customers' fears of investing in the volatile stock market at the time, many of these ads encouraged customers to contact E*Trade directly to discuss money market accounts.

80.     When potential customers would follow these ads and contact E*Trade about its safe, money market accounts, they would be directed to E*Trade's "fixed income specialists" or to the "bond desk."

81.     Once transferred to the bond desk or to a fixed income specialist, these "experts" at E*Trade would encourage the client to invest in ARS, which were uniformly described as cash-like, money market accounts just with better returns.

82.     By selling ARS from its bond desk through "fixed income specialists," E*Trade continued the deception that ARS were fixed income products. E*Trade knew or was reckless in not knowing that that ARS were not fixed income products or traditional bonds.

83.     As part of this same Campaign, E*Trade's financial advisors also contacted investors with significant cash holdings via unsolicited telephone calls and encouraged those investors to invest their cash in the money market-like auction rate securities.

84.     The majority of class members had never heard of auction rate securities prior to these conversations. In response to any questions about the nature of ARS, E*Trade financial advisors passed along the same, limited and misleading information they had been taught at E*Trade: that auction rate securities were equivalent to cash and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

85.     E*Trade, however, knew or was reckless in not knowing that the SEC and the "Big-4" accounting firms had already determined that auction rate securities do not qualify as "cash equivalents" because of their long-term maturity dates.

86.     E*Trade knew or was reckless in not knowing about the auction failures beginning in August 2007. From these failures, E*Trade again knew or was reckless in not knowing that ARS were not cash equivalents and not short term investments.

87.     Because of the auction failures starting in August 2007, E*Trade knew that its previous representations to their clients about the "continu[ing]" growth of the ARS market were false. Despite affirmatively informing their clients about the continuing growth of the ARS

market, E*Trade never took any steps to provide their clients with accurate information regarding the decrease in demand for ARS.

88.     Despite these affirmative representation regarding the "accelerated supply and demand" for ARS and "tremendous growth" in the ARS market, at no time did E*Trade ever follow-up on its email to inform its customers of the dramatic decrease in demand for auction rate securities and the over-supply of ARS.

89.     Instead, E*Trade's financial advisors continued to sell auction rate securities as cash equivalent without disclosing the following material facts about those securities:

   a.    Auction rate securities were not cash alternatives, but were long-term financial instruments with maturity dates of 30 years or longer, or no maturity whatsoever;

   b.    With the exception of some auction rate securities issued by state agencies, municipalities and other government authorities that had maximum rates high enough to attract liquidity or cause the issuer to refinance, auction rate securities lacked features designed to ensure the holder's ability to sell the security, and in the event of an auction failure, the purchaser would be required to hold the security to maturity or indefinitely;

   c.    Many auction rate securities were subject to interest rate caps, which if triggered, would reset their interest rates to levels well below market rates for comparable securities, often as low as zero, and render those securities unmarketable.

   d.    Auction rate securities appeared readily liquid at the time of purchase and sale because broker-dealers were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability;

   e.    The short-term nature of auction rate securities and the ability of investors to liquidate their auction rate securities at par depended on the perpetuation of the artificial auction market by broker-dealers;

   f.    The periodic auctions at which the rates of interest or dividends on auction rate securities were set required that investors actively bid their securities to maximize the rate of return on their investments and minimize the impact of manipulative conduct by the broker-dealers and others, and in the absence of the investor's active participation in the time consuming and highly specialized process of monitoring "price talk" and the bidding process, investors were likely to earn interest or dividends at reduced rates; and

   g.    In the event of persistent auction failures, auction rate securities would be only be saleable at a substantial discount from their purchase price.

90.    E*Trade's financial advisors also sold auction rate securities without disclosing the following material facts about the auction market in which those securities were traded:

a.    ARS auctions started to fail in August 2007 and continued to fail at increasing rates throughout 2007 and early 2008;

b.    ARS, particularly ARS with AAA-ratings, were greatly over-rated and at risk of the same rating downgrades as similarly-backed securities, which Defendants were already downgrading to "below investment grade" on their own books;

c.    Instability for CDO and mortgage-backed securities could similarly impact the liquidity of ARS;

d.    The auction market operated without transparency to investors, thus enabling manipulation by broker-dealers;

e.    The "auctions" for auction rate securities were not true Dutch auctions, as broker-dealers submitted "support" bids and engaged in other manipulative practices for their own accounts in auctions that would have otherwise failed during the Class Period, did so with knowledge of the other bids in the auctions, and often did so after the bidding deadline imposed on other investors;

f.    Broker-dealers routinely intervened in auctions during the Class Period for their own benefit, to set rates and prevent all-hold auctions and failed auctions;

g.    Broker-dealers directly or indirectly set the clearing rate in most of the auctions in which they submitted bids during the Class Period;

h.    Broker-dealers managed the interest rates for auction rate securities to ensure that rates of interest or dividends paid were at levels sufficiently low to attract continued interest from their issuer clients in future auction rate securities issuances, while paying sufficient interest to make auction rate securities saleable to retail investors;

i.    By manipulating the auctions for auction rate securities, broker-dealers prevented investors from learning the true risk, value and liquidity features of auction rate securities;

j.    Broker-dealers intended to continue to market auction rate securities as cash equivalent and highly liquid, safe investments, even if they determined that they were likely to stop supporting and manipulating the auctions; and

k.    Purchasers of auction rate securities were expected to monitor the auctions at all times to protect their interests, as broker-dealers considered themselves free to "manage" auction outcomes and withdraw its support for the auctions at any time.

91.     E*Trade's financial advisors failed to disclose this material information, including but not limited to the information in paragraphs 89-90 above, to investors, in part because E*Trade failed to provide sufficient training to its financial advisors during the Class Period.

92.     During the Class Period, Defendants failed to provide mandatory instruction or compliance training about auction rate securities to E*Trade's financial advisors.  Although E*Trade maintained a "Policies and Procedures Manual" addressing how E*Trade's financial advisors would meet their obligations under state and federal law for marketing and selling securities, the Manual had but a single relevant sentence on auction rate securities: ". . . It is imperative that you fully explain the differences between an ARP [auction rate preferred] and a Money Market . . . ."

93.     Although this language is an acknowledgment by E*Trade that auction rate securities and money market accounts are not similar investments, this single sentence was wholly inadequate to provide E*Trade's financial advisors with sufficient information about the true nature and risks of ARS.  This sentence even failed to provide E*Trade financial advisors with any information to even explain the differences between ARS and money market accounts.

94.     Moreover, E*Trade Financial and E*Trade's management failed to supervise their financial advisors to ensure that these advisors were properly educating their clients about the significant differences between ARS and money market accounts.

95.     Instead, E*Trade's management delegated this training to broker-dealers, including Oppenheimer, who came into E*Trade's offices and provided financial advisors with limited and misleading information.  E*Trade financial advisors attended as few as a single meeting to learn about ARS and these meetings focused almost exclusively on explaining why E*Trade financial advisors should sell ARS to their clients, including that ARS were cash-like, short-term investments similar to money marked accounts.

96.     None of these presentations included a discussion of the maximum rates applicable to auction rate securities, the auction dealers' practice of supporting the auctions, the risk of auction failures, or the risk of illiquidity.  As a result, E*Trade's financial advisors lacked

a rudimentary understanding about how the auction rate securities market functioned during the Class Period.

97.     Moreover, E*Trade financial advisors had, at best, limited knowledge as to the differences between the various types of ARS and the risks associated with the different types of ARS.

98.     When selecting an ARS for a client, E*Trade financial advisors were instead instructed to either contact one of E*Trade's fixed income specialists or to view available ARS posted on the Bond Desk software.  In either scenario, clients were sold ARS based on what ARS were immediately available and not based on what ARS would be the most appropriate based upon the client's unique risk tolerances.

99.     In some instances, the selection of the ARS for a client was based not on the client's unique needs at all, but on what ARS E*Trade had previously purchased or committed to purchase in large blocks.  Throughout the Class Period, E*Trade frequently held an inventory of ARS in its proprietary accounts.  In these instances, E*Trade would sell these pre-purchased ARS to clients, regardless of whether these types of ARS were appropriate for the individual client.

100.    E*Trade's practice was not to deliver a prospectus to Class members who purchased auction rate securities at periodic auctions, as it treated such purchases as "secondary market sales" exempt from the prospectus delivery requirement.

101.    If a client asked for additional information on auction rate securities, rather than providing a copy of a prospectus to clients, E*Trade's financial advisors were trained to instead provided misleading marketing materials drafted by other companies, including Oppenheimer and Nuveen, to their clients.

102.    For example, throughout the Class Period, E*Trade financial advisors forwarded brochures from auction rate securities issuers like Nuveen.  In Nuveen's brochure, Nuveen states that its auction rate securities "compare very favorably with those of other short-term tax-free instruments."  Nuveen states that auction rate securities are appropriate if you are seeking a "cash

alternative before choosing your next longer-term investment." Nuveen stated that its auction rate securities are "an attractive alternative to tax-exempt money market funds[,] commercial paper[,] certificates of deposit[,] U.S. Treasury bills." Nuveen even touted that "the $25,000 share price remains constant, providing a '$1 in, $1 out' feature that means the principal received upon sale will always equal the amount invested." Nuveen finally claimed that "no Nuveen MuniPreferred auction has ever been postponed."

103.    E*Trade also forwarded brochures from Oppenheimer & Co. Inc. discussing auction rate securities.   In a 2005 Oppenheimer brochure that E*Trade sent to its clients throughout the Class Period, Oppenheimer referred to its ARS as "short-term instruments" that are "structured with short-term holding periods for a specified number of days."   In this same brochure, Oppenheimer touted the "competitive bidding process that reflects factors such as the current interest rate environment, comparable yields in alternative short-term cash instruments, and the credit quality of the issue."

104.    E*Trade knew or was reckless in not knowing that these brochures were misleading and omitted key information about ARS and E*Trade did nothing to correct the misstatements and omissions in these brochures.   Moreover, once the ARS markets started to fail in August 2007, E*Trade failed to provide their clients with any information regarding the increased risks of failure, accurate information that ARS are not short-term, cash alternative investments and that companies like Nuveen and Oppenheimer were starting to experience auction failures.

105.    Instead, E*Trade compounded the misleading nature of these marketing materials by even forwarding weekly along auction rate inventory spreadsheets created by broker-dealers, including Oppenheimer, which purported to show the pre-auction "price talk" for the individual ARS.   "Price talk" refers to the guidance generally provided by an auction dealer or other significant market participants to investors about the range of interest or dividend rates at which the auction is expected to clear.

106.    These Oppenheimer spreadsheets purported to show the "low" and "high" price talk on hundreds of ARS and the rating from the three rating agencies for each ARS. These spreadsheets further provided a column entitled "Term," which listed short, fixed periods of time a client would have to hold the ARS. These spreadsheets additionally contained a "reset date" column, which gave clients a misleading understanding as to when they would be able to sell their ARS.

107.    E*Trade brokers continued to provide these spreadsheets up through and including the final weeks of January and the first weeks of February 2008, right up to the wholesale collapse of the ARS market in February 2008. By providing this "price talk," E*Trade perpetuated the façade of a fully functioning, supply and demand driven ARS market. Moreover, by continuing to distribute these spreadsheets so close to the ARS collapse, many of the promised "reset dates" were to occur after the wholesale collapse of the ARS market.

108.    These spreadsheets failed to provide Class Members with information regarding the very real risk that the "term" of the ARS would be indefinite. By January and February 2008, E*Trade knew that the "term" for the ARS it was selling was likely to be indefinite, yet E*Trade failed to provide its clients with any disclosures regarding this specific risk.

109.    Moreover, E*Trade never investigated the accuracy of the spreadsheets it distributed and the representations contained in these spreadsheets, including the "price talk." No where on these spreadsheets is there any indication that the "price talk" was nothing more than numbers manufactured by broker-dealers or bids ultimately submitted by broker-dealers to artificially support the ARS market.

110.    E*Trade continued its misrepresentations and omissions of material fact about auction rate securities in the trade confirmations it sent to clients after they purchased ARS.

111.    Throughout the Class Period and continuing even after the collapse of the ARS market, **E*Trade listed ARS as "cash" on account statements.** When clients would use the E*Trade Portfolio Analyzer, an investment tool available on E*Trade's website, E*Trade again classified ARS as "cash" assets.

112.    E*Trade's Portfolio Analyzer continued to classify ARS as "cash" assets up through at least January 2010, almost two full years after the ARS market collapsed and left clients with illiquid ARS they were unable to sell at par value.

113.    During the Class Period, E*Trade failed to disclose any of the liquidity characteristics of auction rate securities or the risk of auction failure in these trade confirmations.

114.    E*Trade's trading conduct throughout the Class Period was further designed to mislead customers into believing that ARS were cash.  For certain customers, E*Trade would provide instant liquidity between auctions by purchasing the customer's ARS and moving the ARS into E*Trade's own error account.  Likewise, E*Trade would arrange for internal cross trades with other accounts, including other E*Trade accounts.

115.    E*Trade's conduct created a false impression with customers that auction rate securities were readily liquid and that liquidity was not based on any success or failure of any individual auction.

116.    Ultimately, Defendants' aggressive ARS marketing tactics were wildly successful.  In a January 9, 2008 Press Release, Defendants announced the successful outcome of its "Win-Back Campaign."  "Management also reported today that they continue to see turnaround momentum with regard to customer behavior.  Total client assets ended the year at $190 billion, with $33 billion in cash.  This compares to $192 billion and $33 billion, respectively as reported on November 29.  The strength of the Company's value proposition and marketing initiatives continue to attract new customers, with 87,000 gross new accounts opened in December."

117.    While Defendants' tactics improved their bottom line, E*Trade's clients were stuck with millions of dollars worth of illiquid ARS.

118.    E*Trade remains one of the few financial companies who has taken no steps to redeem or restore liquidity to clients across the country who are still, two years later, holding illiquid auction rate securities.

119.   In its February 24, 2010 10-K, Defendants admit that as of February 19, 2010, more than two years after the collapse of the auction rate securities market, Defendants' customers continue to hold approximately $169.7 million in illiquid auction rate securities.

120.   Instead, E*Trade Financial has admitted that its marketing tactics and overall conduct in the ARS market are being investigated by various state and federal authorities.

121.   In its February 24, 2010 10-K, Defendants acknowledged: "Beginning in approximately August 2008, representatives of various states attorneys general and FINRA initiated inquiries regarding the purchase of auction rate securities by E*TRADE Securities LLC's customers."

122.   In this same 10-K, Defendants further acknowledged that on January 19, 2010, the North Carolina Securities Division filed an administrative petition against E*Trade seeking to revoke E*Trade's North Carolina securities dealer registration or, alternatively, to suspend that registration until all North Carolina residents are made whole for their investments in auction rate securities purchased through E*Trade.

123.   After conducting an investigation into E*Trade's marketing and sale of ARS, the North Carolina Securities Division concluded that "the North Carolina customers of [E*Trade], when solicited to purchase ARS products or when inquiring on their own about ARS products, did not receive truthful, accurate or complete information from [E*Trade]."

124.   The North Carolina Securities Division further found that E*Trade's willful failure to supervise its officers, employees and registered financial advisors constituted "egregious violations" of state law as well as the rules established by FINRA and the NASD.

F.     **Lead Plaintiffs' Experiences**

i.     **Roger Bresnahan**

125.   As set forth in his previously filed certification, Lead Plaintiff Roger Bresnahan purchased auction rate securities from E*Trade in March 2005.

126.     Mr. Bresnahan began using E*Trade's electronic trading platform in 2004.  He primarily managed his own accounts, although he occasionally consulted with an E*Trade broker for advice.  Mr. Bresnahan's E*Trade broker was John Gibson.

127.     In March 2005, Mr. Bresnahan received an infusion of cash into his E*Trade account after he sold some investment real estate property.

128.     Mr. Bresnahan consulted Mr. Gibson about where to invest the money and Mr. Gibson recommended that Mr. Bresnahan invest his money in auction rate securities.  Mr. Bresnahan emphasized to Mr. Gibson that he wanted a conservative investment with liquidity. Mr. Gibson assured Mr. Bresnahan that auction rate securities were the equivalent of money market funds and that Mr. Bresnahan's money would become liquid and available every seven days.

129.     Mr. Gibson told Mr. Bresnahan that auction rate securities were safe, short-term investments, that they were similar to money market funds, and that they were good cash management vehicles.  Mr. Gibson never explained the auction process to Mr. Bresnahan nor did he explain the difference between different types of auction rate securities.

130.     Mr. Bresnahan was unfamiliar with auction rate securities and had not considered investing in those securities prior to his conversations with Mr. Gibson.

131.     Based on Mr. Gibson's advice and recommendation, Mr. Bresnahan authorized Mr. Gibson to purchase auction rate securities.  Mr. Bresnahan relied on Mr. Gibson to select the auction rate securities to be purchased.

132.     Neither Mr. Gibson nor any other E*Trade employee provided Mr. Bresnahan with a prospectus for any of the auction rate securities Mr. Bresnahan purchased.

133.     Neither Mr. Gibson nor any other E*Trade employee provided Mr. Bresnahan with a written description of E*Trade's auction rate securities practices and procedures or any written materials concerning auction rate securities before or at the time of Mr. Bresnahan's purchases of those securities.

134.    Neither Mr. Gibson nor any other E*Trade employee explained to Mr. Bresnahan how auction rate securities were traded or priced or that Mr. Bresnahan could seek to influence interest rates by bidding in the auctions.

135.    Neither Mr. Gibson nor any other E*Trade employee explained to Mr. Bresnahan the extent to which the auction rate securities market was being supported by broker-dealers.

136.    Neither Mr. Gibson nor any other E*Trade employee informed Mr. Bresnahan of the information in paragraphs 89-90 before Mr. Bresnahan bought auction rate securities from E*Trade.

137.    While Mr. Bresnahan has had some of his auction rate securities redeemed, he continues to hold illiquid ARS that he has been unable to sell at par since the auction rate securities market collapsed on or around February 13, 2008.

138.    Had Mr. Bresnahan known about the information in paragraphs 89-90, he would not have purchased auction rate securities from E*Trade or would not have done so at the prices he paid.

ii.    **Srinivisan Murari**

139.    As set forth in his previously filed certification, Lead Plaintiff Srinivisan Murari purchased auction rate securities from E*Trade in January 2008.

140.    Mr. Murari began using E*Trade's electronic trading platform in 1997 and he had never previously worked with an E*Trade broker.

141.    In late 2007, Mr. Murari received an unsolicited telephone call from an E*Trade broker trying to sell him auction rate securities. The broker's name was William Welthaus.

142.    Mr. Welthaus told Mr. Murari that auction rate securities were the equivalent of money market funds and "as good as cash." After Mr. Murari explained that he wanted liquidity for his investment, Mr. Welthaus told Mr. Murari that he could sell his auction rate securities every week.

143.    Mr. Welthaus told Mr. Murari that auction rate securities were safe, short-term investments, that they were similar to money market funds, and that they were good cash

management vehicles. Mr. Welthaus never explained the auction process to Mr. Murari nor did he explain the difference between different types of auction rate securities.

144. Mr. Murari was unfamiliar with auction rate securities and had not considered investing in those securities prior to receiving the unsolicited telephone call from Mr. Welthaus.

145. Based on Mr. Welthaus' representations, Mr. Murari authorized Mr. Welthaus to purchase auction rate securities. Mr. Murari relied on Mr. Welthaus to select the auction rate securities to be purchased. After his initial purchase of auction rate securities, Mr. Murari liquidated his investment one week later to verify Mr. Welthaus's assertions regarding the liquidity of auction rate securities. After Mr. Murari was able to liquidate his initial investment, he re-invested in auction rate securities in January 2008.

146. Neither Mr. Welthaus nor any other E*Trade employee provided Mr. Murari with a prospectus for any of the auction rate securities Mr. Murari purchased.

147. Neither Mr. Welthaus nor any other E*Trade employee provided Mr. Murari with a written description of E*Trade's auction rate securities practices and procedures or any written materials concerning auction rate securities before or at the time of Mr. Murari's purchases of those securities.

148. Neither Mr. Welthaus nor any other E*Trade employee explained to Mr. Murari how auction rate securities were traded or priced or that Mr. Murari could seek to influence interest rates by bidding in the auctions.

149. Neither Mr. Welthaus nor any other E*Trade employee explained to Mr. Murari the extent to which the auction rate securities market was being supported by broker-dealers or that ARS auctions were already failing.

150. Neither Mr. Welthaus nor any other E*Trade employee informed Mr. Murari of the information in paragraphs 89-90 before Mr. Murari bought auction rate securities from E*Trade.

151.    While Mr. Murari has had some of his auction rate securities redeemed by the issuers of these ARS, he continues to hold illiquid ARS that he has been unable to sell at par since the auction rate securities market collapsed on or around February 13, 2008.

152.    Had Mr. Murari known about the information in paragraphs 89-90, he would not have purchased auction rate securities from E*Trade or would not have done so at the prices he paid.

## NO SAFE HARBOR

153.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

154.    The statements pleaded herein were not identified as "forward-looking statements" when made.

155.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

156.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of E*Trade who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

157.    As alleged above, during the Class Period, Defendants engaged in a scheme and course of conduct to create, prop up and perpetuate for their own benefit an artificial market for auction rate securities and to inflate the perceived value of those securities to the detriment of Lead Plaintiffs and Class members.

158.     This scheme and course of conduct operated as a fraud or deceit on Lead Plaintiffs and Class members by, among other things, omitting to disclose material foreseeable risks concerning the market for auction rate securities and the value, safety and liquidity risks of those investments.

159.     The materialization of the risks concealed by Defendants was foreseeable to Defendants throughout the Class Period.

160.     Those risks materialized when most of the auctions failed on or about February 13, 2008, because broker-dealers refused to continue serving as buyers of last resort.

161.     Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Lead Plaintiffs and Class members.

162.     Only through the persistent conduct of Defendants in misrepresenting the nature of ARS and broker-dealers in artificially supporting, maintaining and intervening in the auctions and acting as buyers of last resort was the market for auction rate securities able to exist during the Class Period.

163.     It was materially deceptive for Defendants to represent to Lead Plaintiffs and the Class that auction rate securities were cash equivalents or highly liquid investments.

164.     Defendants also failed to disclose to Lead Plaintiffs and Class members that the auction rate securities market depended on the voluntary, pervasive and ongoing participation of broker-dealers in the auctions.

165.     When the auctions failed on or around February 13, 2008, the concealed risks that auction rate securities would stop trading as cash equivalents materialized.

166.     Because of Defendants' failure to disclose these and other material risks, Lead Plaintiffs and Class members were damaged when broker-dealers withdrew their support for the auction market.

167.     If not for Defendants' omissions and false and misleading statements of material fact about auction rate securities and the auction market in which those securities were traded,

Lead Plaintiffs and Class members would not have purchased auction rate securities or would not have purchased them for the prices and/or at the interest rates at which they did.

168.    Among other things, Defendants' deceptive conduct caused the interest and dividend rates on auction rate securities both before and after the collapse of the auction market to be considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of auction rate securities and the auction market.

169.    Accordingly, Defendants' wrongdoing directly or proximately caused economic losses to Lead Plaintiffs and Class members by rendering their auction rate securities illiquid and by limiting the interest and dividends that they would have otherwise received.  Lead Plaintiffs and Class members remain unable to sell their auction rate securities and continue to receive interest and/or dividends on those securities at below market rates that are insufficient to compensate for the lack of liquidity features inherent in the securities.

170.    Given the higher interest and dividend rates both before and after the collapse of the auction market that would have resulted from full disclosure, Lead Plaintiffs and Class members would have been able to acquire a lower face amount of auction rate securities while still obtaining the same dollar amount of interest or dividends they received on the auction rate securities actually purchased.

171.    As a result of the materialization of the concealed risks, the perceived values of auction rate securities have declined substantially.  Auction rate securities that E*Trade sold to Class members remain illiquid and are unable to be sold at par.  Investors who have sold their auction rate securities on a recently developed secondary market have done so at steep discounts to par value.  Finally, following the collapse of the auction rate securities market, Lead Plaintiffs and Class members received interest on their auction rate securities at below-market rates that are insufficient to compensate for the lack of liquidity features that are inherent in the securities.

## TRANSACTION CAUSATION:

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

### A.    Reliance on Material Omissions

172.   To the extent required, a presumption of reliance is applicable here due to E*Trade's use of standardized sales pitches which omitted on a uniform basis the material facts described in paragraphs 89-90 regarding auction rate securities and the auction market in which those securities were traded.

173.   The facts described in paragraphs 89-90, which E*Trade failed to disclose, were material in that there is a substantial likelihood that the disclosure of these facts would have been viewed by a reasonable investor as having significantly altered the total mix of information about auction rate securities made available.

174.   E*Trade's financial advisors were required to and did use uniform, standardized and materially identical sales pitches created and/or approved by E*Trade's senior management to market and sell auction rate securities to Lead Plaintiffs and Class members.  The sales pitch did not vary appreciably, if at all.

175.   In light of Defendants' knowledge that their sales force routinely represented to investors that auction rate securities were safe, highly liquid investments with interest rates established by periodic auctions, it was materially misleading for Defendants to fail to correct the record and state expressly that auction rate securities were, among other things, neither safe nor liquid investments and/or had interest rates managed by broker-dealers.

176.   Lead Plaintiffs and Class members would not have invested in auction rate securities, or alternatively, would not have purchased those securities on the terms at which they did, had Defendants' omissions of material fact not concealed the true nature of those securities and the auction market in which those securities were traded.

177.   Lead Plaintiffs' and Class members' fraud-based claims stem primarily, if not exclusively, from these omissions of material fact for which reliance may be presumed.

31

**B.**    **Fraud on the Market**

178.    In the alternative, and to the extent required, a presumption of reliance is applicable here because the auction rate securities market was well-developed and efficient throughout the Class Period.

179.    The presumption of reliance, based on the fraud-on-the-market doctrine, is applicable here, because among other things:

a.    Defendants made false and misleading omissions and misrepresentations of fact concerning auction rate securities during the Class Period;

b.    The omissions and misrepresentations were material in that there is a substantial likelihood that the disclosure of these facts would have been viewed by a reasonable investor as having significantly altered the total mix of available information about auction rate securities;

c.    The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge, among other things, the value of the securities at issue; and

d.    Lead Plaintiffs and Class members purchased auction rate securities after Defendants made these omissions and misrepresentation, and did so without knowledge of the omitted and misrepresented facts.

180.    Auction rate securities and the auction market have existed since 1984, and have developed rapidly since that time.

181.    Throughout the Class Period, the auction market digested current information regarding auction rate securities and reflected that information in the prices of those securities.

182.    Material news concerning auction rate securities had a prompt and immediate effect on the market price of those securities, as evidenced by, among other things, the rapid decline in the market price occurring after the collapse of the auction market in February 2008.

183.    Under these circumstances, all purchasers of auction rate securities suffered similar injury due to the fact that those securities were overvalued throughout the Class Period.

184.    When Lead Plaintiffs and Class members purchased auction rate securities, they did not know about, and could not reasonably have discovered, Defendants' wrongful conduct alleged in this Complaint.

32

185.   Lead Plaintiffs and Class members would not have purchased auction rate securities from Defendants, or alternatively, would not have purchased those securities on the terms at which they did, but for Defendants' misconduct.

<u>COUNT I</u>

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5(b) Promulgated Thereto
Against E*Trade By Lead Plaintiffs And The Class**

186.   Lead Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Lead Plaintiffs brings this cause of action on behalf of themselves and the Class against E*Trade.

187.   During the Class Period, E*Trade employed manipulative or deceptive devices or contrivances, in contravention of Rule 10b-5(b) promulgated by the SEC, which were intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiffs and Class members and caused Lead Plaintiffs and Class members to purchase overvalued auction rate securities from E*Trade.

188.   During the Class Period, E*Trade engaged in a scheme to defraud and made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

189.   E*Trade directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a comprehensive scheme to defraud and a continuous course of conduct to conceal adverse material information about auction rate securities, as specified herein including in particular the information specified in paragraphs 89-90 above.

190.   The information that E*Trade failed to disclose to Lead Plaintiffs and Class members was material in that there is a substantial likelihood that the disclosure of the omitted

information would have been viewed by a reasonable investor as having significantly altered the total mix of information about auction rate securities made available.

191.   E*Trade employed manipulative or deceptive devices or contrivances, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Lead Plaintiffs and Class members that auction rate securities were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors.

192.   E*Trade had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that it failed to ascertain and to disclose such facts.

193.   E*Trade had the motive and opportunity to commit the fraud alleged herein.

194.   As E*Trade continued to experience significant financial losses in 2007, E*Trade increasingly relied on convincing new and existing clients to deposit more and more cash with E*Trade or to invest in financial vehicles E*Trade classified as cash-equivalent, like ARS.  As E*Trade Financial's COO admitted in 2007" "These positive customer metrics . . . are **particularly important** this quarter given the disruption in the credit markets and the **impact that this has on the perceived stability of our business.**"

195.   By convincing clients, who were worried about the turmoil in the stock market, that ARS were safe and money-market like, E*Trade convinced record numbers of individuals to purchase ARS in new accounts with E*Trade or increase their ARS holdings in existing accounts.

196.   In addition, auction rate securities were highly profitable for E*Trade.

197.   The fees paid to E*Trade for remarketing auction rate securities were particularly attractive to E*Trade as they allowed E*Trade to profit from its clients' short-term, cash management investments.  These investments would ordinarily have been committed to other cash management vehicles such as money market funds, from which E*Trade would stand to earn little or no additional revenue.

198.   E*Trade's compensation for ARS sales were an initial sales commission, an ongoing "trailing" sales commission or both.

199.   In addition or in the alternative, there is strong evidence that E*Trade consciously misbehaved or was reckless in its behavior.

200.   E*Trade's behavior was highly unreasonable and represents an extreme departure from the standards of ordinary care.  The risks in the ARS market were either known to E*Trade or so obvious that E*Trade must have been aware of these risks.

201.   Since 2005, E*Trade either knew, should have known or had access to information contradicting its repeated and uniform representations that ARS were cash equivalents or short-term investments.  Despite this knowledge, E*Trade continued to market ARS to its clients as highly liquid, short term, cash-equivalents.

202.   E*Trade either knew or was reckless in not knowing that that the auction rate securities market was increasingly unstable beginning no later than August 2007, when the first auctions began to fail.

203.   Moreover, E*Trade additionally knew or was reckless in not knowing that that the ARS market was increasingly unstable as auctions continued to fail through 2007 and early 2008.

204.   In addition, despite E*Trade downgrading AAA-rated, CDO securities on its own books to below "investment grade," E*Trade failed to provide its clients with any information or disclosures that ARS, including but not limited to AAA-rated CDO auction rate securities, were similarly over-rated by these same rating agencies.

205.   More generally, despite so much market instability in Third and Fourth Quarter of 2007 that E*Trade's management announced that "it is no longer beneficial to provide earnings expectations for the remainder of the year," E*Trade never provided its clients with any disclosure of the increased risks to the ARS market from these same market forces.

206.   Despite this knowledge, E*Trade made the material misrepresentations and/or omissions described herein knowingly or deliberately and for the purpose and effect of (a)

35

concealing the truth about the value, liquidity and risks of auction rate securities from Lead Plaintiffs, Class members and the investing public, and (b) supporting the overvalued price and market for auction rate securities.

207.    If E*Trade did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge and refraining from taking those steps necessary to discover whether its statements were false or misleading.

208.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of auction rate securities sold by E*Trade was artificially inflated during the Class Period.

209.    In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements or omissions of material fact made by E*Trade, and/or on the absence of material information that was known to or deliberately disregarded by E*Trade but not disclosed in public statements by E*Trade during the Class Period, and/or on the integrity of the auction market in which auction rate securities traded, Lead Plaintiffs and Class members acquired overvalued auction rate securities from E*Trade during the Class Period and were damaged thereby.

210.    At the time of said misrepresentations and omissions, Lead Plaintiffs and Class members were ignorant of their falsity, and believed them to be true.

211.    Lead Plaintiffs and Class members acted with due diligence, did not act with recklessness, and could not have discovered the true facts that E*Trade misstated and/or failed to disclose.

212.    Had Lead Plaintiffs, Class members and the marketplace known the truth regarding the value, liquidity and risks of auction rate securities, which were not disclosed by E*Trade, Lead Plaintiffs and Class members would not have purchased auction rate securities from E*Trade, or, if they had acquired such securities during the Class Period, they would not have done so at the overvalued prices which they paid.

213.    By virtue of the foregoing, E*Trade violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

214.    As a direct and proximate result E*Trade's wrongful conduct, Lead Plaintiffs and Class members suffered damages in connection with their respective purchases of auction rate securities from E*Trade during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against E*Trade Financial By Lead Plaintiffs And The Class

215.    Lead Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Lead Plaintiffs brings this cause of action on behalf of themselves and the Class against E*Trade Financial.

216.    E*Trade Financial acted as a controlling person of E*Trade within the meaning of Section 20(a) of the Exchange Act for the reasons alleged in this Complaint.

217.    By virtue of its operational and management control of E*Trade's business and systematic involvement in the fraudulent scheme alleged in this Complaint, E*Trade Financial had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of E*Trade, including the content and dissemination of the various statements and omissions of material fact which Lead Plaintiffs contends are false and misleading.

218.    E*Trade Financial had the ability to prevent the issuance of the statements and omissions of material facts described in this Complaint.

219.    E*Trade Financial had direct and supervisory involvement in the operations of E*Trade, and therefore, is presumed to have had and exercised the power to control or influence the particular conduct giving rise to the securities violations alleged in this Complaint.

220.    As set forth above E*Trade violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by its acts and omissions as alleged in this Complaint.

221.    By virtue of its positions as a controlling person, E*Trade Financial is liable pursuant to Section 20(a) of the Exchange Act.

222.    As a direct and proximate result of E*Trade Financial's wrongful conduct, Lead Plaintiffs and Class members suffered damages in connection with their purchase of auction rate securities from E*Trade during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as a representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs' Lead Counsel as counsel for the Class;

B.    Awarding damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution and disgorgement of ill-gotten gains in favor of Lead Plaintiffs and Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding Lead Plaintiffs and the Class pre-judgment and post-judgment interest;

E.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

F.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demands a trial by jury.

Dated: April 22, 2010

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

Norman E. Siegel (admitted *pro hac vice*)
Rachel E. Schwartz (admitted *pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:     (816) 714-7100
Facsimile:     (816) 714-7101

**Plaintiffs' Lead Counsel**

**Additional Counsel:**

Christopher A. Seeger (CS-4880)
Stephen A. Weiss (SW-3520)
David R. Buchanan (DB-6368)
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

## CERTIFICATE OF SERVICE

J. Daniel Mora, being duly sworn, hereby deposes and says:

I am over the age of eighteen years and not a party to the within action and am

employed by the firm Seeger Weiss LLP, counsel for the plaintiff.

On April 22, 2010 I cause a true and correct copy of the foregoing

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECURITIES LAWS,

to be served via U.S. Mail, with proper postage prepaid on all counsel of record at the

following addresses:

| | |
|---|---|
| Nicolas Morgan<br>Perrie M. Weiner<br>Joshua Samuel Sohn<br>**DLA Piper US LLP**<br>1251 Avenue of the Americas<br>New York, NY 10020-1104 | Perrie M. Weiner<br>Gregg P. Zucker<br>**DLA Piper US LLP**<br>1999 Avenue of the Stars<br>Suite 400<br>Los Angeles, CA 90067 |
| Representing E*Trade Financial<br>Corporation, E*Trade Securities LLC | Representing E*Trade Financial<br>Corporation, E*Trade Securities LLC |

Dated:  April 22, 2010

J. Daniel Mora