UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
JOHN W. OUGHTRED, Individually and on          :
Behalf of All Others Similarly Situated,       :
                                               :        08 Civ. 3295 (SHS)
                                  Plaintiff,    :
                                               :        OPINION & ORDER
                   -against-                   :
                                               :
E*TRADE FINANCIAL CORPORATION &                :
E*TRADE SECURITIES LLC,                        :
                                               :
                                  Defendants.  :
--------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       Plaintiffs Roger Bresnahan and Srinivasan Murari[1] bring this putative class action

pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.

§§ 78j(b), 78t(a), 78t-1(a), and Securities and Exchange Rule 10b-5 promulgated under that

statute, 17 C.F.R. § 240.10b-5, alleging that defendants E*Trade Financial Corporation and

E*Trade Securities LLC defrauded purchasers of auction rate securities by making

misrepresentations and omissions of material fact about the risks, value, and liquidity of those

securities.  Defendants have moved to dismiss the complaint on the grounds that plaintiffs have

not adequately pled any of the elements required to succeed on their claims.  Because plaintiffs

fail to establish the strong inference of scienter required to state a claim for relief pursuant to

Section 10(b) and Rule 10b-5, defendants' motion is granted.

I.      BACKGROUND

       The following facts are taken from the Second Amended Complaint ("SAC") and are

presumed to be true for purposes of this motion.

---

[1] Plaintiff John Oughtred voluntarily dismissed his claims against defendants pursuant to Federal Rule of Civil
Procedure 41(a)(1)(A)(i) on March 12, 2009.

A.  Parties

Roger Bresnahan and Srinivasan Murari purchased auction rate securities ("ARS") from defendant E*Trade Securities LLC ("E*Trade") during the class period of April 3, 2003 to February 13, 2008 ("Class Period").  (SAC ¶¶ 2, 13-14.)  Defendant E*Trade Financial Corporation ("E*Trade Financial") is a financial firm that conducts a brokerage business through its subsidiary, defendant E*Trade.  (*Id.* ¶ 15.)  E*Trade Financial and E*Trade are Delaware corporations headquartered in New York.  (*Id.* ¶¶ 15-16.)

B.  ARS

ARS are long-term debt or preferred stock that pay variable interest rates set at periodic auctions.  (*Id.* ¶ 28.)  Buyers in these auctions specify the number of ARS they want and the lowest interest rate at which they are willing to purchase those securities.  The lowest rate at which there are sufficient buyers to purchase all of the ARS sets the clearing rate, which then applies to all of the ARS until the next auction.  (*Id.* ¶¶ 32, 35.)  If buyers do not offer enough bids to purchase all the securities offered at an auction, then the auction fails and no securities sell.  (*Id.* ¶ 35.)  In the event of an auction failure, ARS holders receive a predetermined rate of return on their investment known as the "maximum rate." (*Id.* ¶ 36.)  However, there is no guarantee that this maximum rate will be high enough to attract new buyers.  (*Id*. ¶¶ 37-38.)

C.  Support Bids and the ARS Market Failure

First created in the mid-1980s, the market for ARS grew to over $300 billion in outstanding securities by February 2008.  (*Id*. ¶ 31.)  Until August 2007, auction dealers followed "uniform policies" of using their own capital to "plac[e] support bids in auctions as necessary to prevent auction failures."  (*Id.* ¶ 41.)  These support bids created an outward appearance of liquidity that, according to plaintiffs, did not in truth exist.  (*Id*. ¶¶ 39-43, 46-47.)

In August 2007 auction dealers began allowing a limited number of auctions to fail.  (*Id.* ¶ 41.)
Then, in February 2008, the ARS market abruptly collapsed when auction dealers ceased
intervening in the auctions.  (*Id*. ¶¶ 8, 44.) That collapse meant ARS holders were saddled with
billions of dollars of securities they could not sell.  (*Id*.)

D.  E*Trade's Involvement with ARS

E*Trade did not issue ARS or underwrite ARS or directly bid in ARS auctions.  Rather, it
acted primarily as a "remarketing agent" who sold hundreds of millions of dollars of ARS to its
clients during the Class Period and transmitted its clients' orders to auction dealers.  (*Id.* ¶¶ 34,
56.)  E*Trade allegedly "held an inventory of ARS in its proprietary accounts" and sought to
"sell these pre-purchased ARS to clients."  (*Id.* ¶ 99.)  Moreover, plaintiffs allege that "[f]or
certain customers, E*Trade would provide instant liquidity between auctions by purchasing the
customer's ARS and moving the ARS into E*Trade's own error account" or by selling these
ARS to other customers.  (*Id.* ¶ 114.)  E*Trade allegedly led clients to believe that ARS were
highly liquid, short-term investments similar to money market funds, when in fact they were not.
(*Id*. ¶¶ 3-4.)

E.  Plaintiffs' Purchase of ARS

Bresnahan and Murari purchased ARS through E*Trade based exclusively on the advice
of E*Trade brokers.  (*Id*. ¶¶ 13-14, 125-31, 139-45.)  Around March 2005, Bresnahan consulted
with his E*Trade broker, John Gibson, seeking "a conservative investment with liquidity."  (*Id*. ¶
128; *see also* ¶ 127.)  Gibson recommended ARS.  (*Id*. ¶ 128-29.)  He allegedly assured
Bresnahan that ARS "were the equivalent of money market funds" and that Bresnahan's "money
would become liquid and available every seven days," the period of time between auctions.  (*Id*.
¶ 128.)

Murari received an unsolicited telephone call from E*Trade broker William Welthaus in late 2007, (*id.* ¶ 141), during which Welthaus told Murari that ARS "were the equivalent of money market funds and 'as good as cash.'" (*Id.* ¶ 142.)  In response to Murari's concerns about liquidity, Welthaus assured him that he could sell his ARS "every week." (*Id.*)

Neither the brokers, nor any other E*Trade employees, provided plaintiffs with any written materials or otherwise explained the risks of the ARS market. (*Id.* ¶¶ 132-36, 146-50.) Plaintiffs claim that had they known about the risks of ARS ownership, they would not have bought ARS from E*Trade or done so at the prices they paid. (*Id.* ¶¶ 138, 152.)  Although some of plaintiffs' ARS have been redeemed by the issuers, E*Trade has not repurchased any of the ARS they sold plaintiffs. (*Id.* ¶¶ 13-14.)  Since the ARS markets collapsed in February 2008, plaintiffs have been unable to sell their ARS "at par" and have allegedly been damaged as a result. (*Id.* ¶¶ 137-38, 151-52.)

F.   E*Trade's Other Alleged Misstatements and Omissions

Plaintiffs allege that throughout the Class Period, E*Trade supplied clients with documents that contained misleading statements about ARS.  For instance, if a client asked for written information about ARS, E*Trade financial advisors would forward marketing materials created by companies that actually issued ARS, such as Oppenheimer and Nuveen, rather than sending a prospectus or materials written by E*Trade. (*Id.* ¶¶ 101-04.)  These materials described ARS as short-term investments that were a "cash alternative." (*Id.* ¶ 102.)  E*Trade also forwarded weekly spreadsheets from auction dealers with "price talk" about the range of interest rates at which an auction was expected to clear and a "Term" during which an ARS buyer would have to hold the securities between periodic auctions. (*Id.* ¶¶ 105-06.)  Moreover, E*Trade allegedly listed ARS as "cash" on customers' account statements and in the "Portfolio

Analyzer" tool on the E*Trade website.  (*Id*. ¶¶ 111-12.)  E*Trade did not disclose the role of auction dealers who supported ARS auctions or what would happen if ARS auctions failed.  (*Id*. ¶ 89.)

In the "Summer 2007," E*Trade emailed its existing customers to encourage them to purchase ARS, stating that "[t]he ARS market continues to experience tremendous growth and our electronic trading platform will further fulfill accelerated supply and demand for this currently under-serviced asset class."  (*Id.* ¶ 75.)  E*Trade also made unsolicited telephone calls to customers with significant cash holdings, encouraging them "to invest their cash in the money market-like auction rate securities."  (*Id.* ¶ 83.)  Then, in a December 21, 2007 press release, E*Trade Financial announced "an aggressive customer win-back campaign."  (*Id.* ¶ 78.)  When customers responded to this campaign's television or internet advertisements with inquiries about money market accounts, they were directed to E*Trade's "fixed income specialists" or "bond desk," which encouraged investment in ARS.  (*Id*. ¶¶ 79-81.)

Plaintiffs allege that "once the ARS markets started to fail in August 2007, E*Trade failed to provide their clients with any information regarding the increased risks of failure, accurate information that ARS are not short-term, cash alternative investments and that companies like Nuveen and Oppenheimer were starting to experience auction failures."  (*Id.* ¶ 104.)

G.  E*Trade's Alleged Fraudulent Intent

Plaintiffs allege that during the Class Period E*Trade sold ARS to customers as highly liquid, short-term, cash-like investments, when in truth E*Trade knew, or at least were reckless in not knowing, that ARS were not cash equivalents.  (*Id*. ¶¶ 3-4.)  Since at least March 2005, the "Big-4" accounting firms, the Financial Accounting Standards Board ("FASB"), and the

Securities and Exchange Commission have adopted the position that ARS do not qualify as "cash equivalents."  (*Id.* ¶ 59.)  Moreover, purchase of ARS from E*Trade allegedly required the involvement of an E*Trade financial advisor, (*id.* ¶ 57), and "E*Trade maintained a 'Policies and Procedures Manual' addressing how its financial advisors would meet their obligations under state and federal law for marketing and selling securities."  (*Id.* ¶ 92.)  The single sentence in this manual concerning ARS stated that "[i]t is is imperative that you fully explain the differences between an ARP [auction rate preferred] and a Money Market."  (*Id.*)

Nonetheless, defendants allegedly failed to provide E*Trade's financial advisors with sufficient training about the true nature and risks of ARS.  (*Id.* ¶¶ 91-94.)  According to plaintiffs, "E*Trade's management delegated this training to broker-dealers," including broker-dealers from Oppenheimer, "who came into E*Trade's offices and provided financial advisors with limited and misleading information."  (*Id.* ¶ 95.)  "As a result, E*Trade's financial advisors "lacked a rudimentary understanding" of the ARS market.  (*Id.* ¶ 96.)

Plaintiffs further allege that by fall 2007 E*Trade knew or at least was reckless in not knowing that ARS markets were collapsing, yet aggressively sold ARS to raise much-needed cash.  In an October 17, 2007 earnings call Mitchell Caplan—E*Trade Financial's Chief Executive Officer—acknowledged "unprecedented disruptions" in the credit markets in the third quarter of 2007.  (*Id.* ¶ 62.)  He specifically discussed E*Trade Financial's losses related to collateralized debt obligations ("CDOs") and securities collateralized by second lien mortgages.  (*Id.* ¶ 63.)  He also addressed the company's decision to "writ[e] down securities rated lower than AA."  (*Id.*)  Less than a month later, in a November 9, 2007 press release, E*Trade Financial announced that it was "downgrading $50 million of AAA rated asset-backed CDOs on

its books to below investment grade" and mentioned "the potential for future downgrades by rating agencies." (*Id.* ¶ 68.)

According to plaintiffs, E*Trade's ARS sales were critical to defendants' financial stability. During the October earnings call, Caplan and Jarrett Lilien—E*Trade Financial's Chief Operating Officer—"both emphasized the importance of E*Trade's customers continuing to maintain cash deposits, including in assets like ARS that E*Trade classified as cash, in their E*Trade accounts." (*Id.* ¶ 65.) Lilien added that, in light of disruptions in the credit market, customers putting more money into the market and into their E*Trade accounts has an impact "on the perceived stability of our business." (*Id.* ¶ 66.) Thus, plaintiffs allege that because of substantial losses related to asset-backed securities, both defendants "needed to manufacture the 'perceived stability' of its business by significantly increasing the cash deposits from its clients." (*Id.* ¶ 72.) In order to increase cash deposits, defendants aggressively marketed ARS—including AAA-rated CDO ARS—as safe, short-term, cash-like investments, despite specific knowledge of increasing turmoil in the credit markets and a decision to downgrade other AAA-rated investments. (*Id.* ¶¶ 69-72.)

H. This Action

Plaintiffs commenced this action in the spring of 2008 and filed a First Amended Complaint in December 2008. This Court subsequently dismissed that First Amended Complaint for failure to plead scienter adequately and granted leave to replead. (Order dated March 18, 2010.) Plaintiffs then filed this SAC in April 2010, asserting a securities fraud claim against E*Trade for violation of section 10(b) of the Exchange Act and Rule 10b-5, and a control person liability claim against E*Trade Financial for violation of section 20(a) of the Exchange Act. Defendants have now moved to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6),

arguing that plaintiffs have not alleged actionable misstatements or omissions by defendants; have failed to plead scienter, reliance, or causation; and have failed to state a claim for control person liability.

## II.   DISCUSSION

### A.   Legal Standard

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006).  A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

A complaint alleging securities fraud is subject to two heightened pleading standards.  First, the complaint must satisfy Rule 9(b), which requires that it "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

B.  Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice "in connection with the purchase or sale of any [registered] security."  15 U.S.C. § 78j(b).  Rule 10b-5—which the SEC promulgated pursuant to section 10 of the Exchange Act— states that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.   To state a claim for securities fraud pursuant to Section 10(b) and Rule 10b-5, a complaint must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  *In re Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998).

Defendants contend that plaintiffs have failed to plead actionable misstatements or omissions, scienter, reliance, or causation.  The Court concludes that plaintiffs have not alleged facts that support a strong inference of scienter, and it thus need not address defendants' remaining arguments.

1.  *Plaintiffs' Failure to Plead Scienter*

A complaint asserting a claim pursuant to Section 10(b) and Rule 10b-5 must allege that the defendant acted with scienter.  On a motion to dismiss, the court must "consider the complaint in its entirety," inquiring "whether *all* of the facts alleged, taken collectively, give rise

to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original).  "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . . A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323-24.

To plead scienter when the defendant is a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  "In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant." *Id.* However, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.*  For example, the scienter of an employee acting within the scope of employment can be imputed to the employer.  *See Vining v. Oppenheimer Holdings Inc.*, No 08 Civ. 4435, 2010 WL 3825722 at *12 (S.D.N.Y. Sept. 29, 2010) (citing *Defer LP v. Raymond James Financial, Inc.*, 654 F. Supp. 2d 204, 212 (S.D.N.Y. 2009)).  A strong inference of corporate scienter may also be appropriate "where a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" *Vining*, 2010 WL 3825722 at *13 (citing *Teamsters Local 445*, 531 F.3d at 196 (internal citation omitted)).

The United States Court of Appeals for the Second Circuit has explained that a complaint may establish a strong inference of scienter in a Section 10(b) or Rule 10b-5 action by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  Plaintiffs attempt to plead scienter under both prongs.  The Court first considers plaintiffs allegations under each prong and concludes that they are, under Second Circuit precedent, insufficient to establish a strong inference of scienter.  The Court then proceeds to the *Tellabs* analysis and, viewing the whole factual picture painted by the SAC, finds that the more cogent and compelling inference is that defendants lacked fraudulent intent.

        a.  Motive and Opportunity

To plead that the defendants had a "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 197, 198 (2d Cir. 2009).  A classic case of motive to commit fraud exists "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.*

Plaintiffs here do not allege any insider trading whatsoever.  Instead, they offer two other theories of defendants' motive to commit fraud.  First, plaintiffs contend that E*Trade's "misrepresentations were designed to increase the total number and amount of the purported 'cash' deposits by E*Trade's brokerage customers, which Defendants admitted were essential to

creating the 'perception' that E*Trade was a financially stable and liquid company."  (Pls.'Mem.
in Opp. to Defs.' Mot. to Dismiss ("Pls.' Opp.") at 14 (citing SAC ¶ 66).)  In other words,
E*Trade wanted to create the perception of attracting cash during difficult financial times.  This
purported motive is no more "concrete and personal" than a desire to create the appearance of
profitability.  As such, the motive is too generalized to create to a strong inference of scienter.
*See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d. 294, 305 (S.D.N.Y. 2009)
("Defendants' desire to sell Citigroup ARS to offset subprime market losses and to obtain fees
. . . are insufficient to give rise to a strong inference of scienter.") (citing *Kalnit v. Eichler*, 264
F.3d 131, 140 (2d Cir. 2001)); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)
("The motive to maintain the appearance of corporate profitability   . . . will naturally involve
benefit to a corporation but does not 'entail concrete benefits.'" (internal citation omitted)).

 Plaintiffs' second proffer for a motive to commit fraud is set forth essentially only in
plaintiffs' opposing memorandum of law.  That motive is E*Trade's alleged desire to unload
"the increasingly risky ARS on its own books to . . . unsuspecting customers."  (Pls.' Opp. at 15.)
That motive, however, can barely be discerned within the SAC.  It rests on a single, conclusory
allegation in the 222-paragraph-long SAC that "[t]hroughout the Class Period, E*Trade
frequently held an inventory of ARS in its proprietary accounts" and sought to "sell these pre-
purchased ARS to clients."  (SAC ¶ 99.)  Plaintiffs do not state with particularity any facts giving
rise to a cogent inference that E*Trade was motivated to commit fraud in order to reduce its own
inventory of risky ARS.

 In contrast to the unspecific allegations of motive here, in *Defer LP v. Raymond James
Financial, Inc.* the plaintiff purchasers of ARS established a cogent inference of scienter by
pleading with substantial particularity that a defendant broker-dealer was motivated to unload its

own inventory of ARS in order to reduce its exposure to the "soon-to-be-illiquid securities."

2010 WL 3452387, at *5 (S.D.N.Y. Sept. 2, 2010).  The plaintiffs there relied on allegations that:

> (1) the ARS market deteriorated between August 2007 and February 2008, (2) RJA employees sent three emails in November and December 2007 to financial advisors allegedly indicating that RJA had a large inventory of ARS and offering incentives to sell them, and (3) RJA needed to sell ARS in late 2007 to comply with its internal risk limits.

*Id.*  In this case, plaintiffs have not indicated the size of E*Trade's alleged ARS position or

explained how the "increasingly risky" nature of ARS affected E*Trade's holdings.  The mere

fact that E*Trade owned ARS throughout the Class Period is insufficient.  Accordingly,

plaintiffs have failed to plead motive and opportunity with adequate particularity to create a

strong inference of scienter.

                    b.   Circumstantial Evidence of Conscious Misbehavior or Recklessness

        "Where motive is not apparent, it is still possible to plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142.

"Intentional misconduct is easily identified since it encompasses deliberate illegal behavior . . . ."

*Novak*, 216 F.3d at 308.  Strong circumstantial evidence of reckless conduct also gives rise to an

inference of scienter, so long as the complaint alleges "conduct which is highly unreasonable and

which represents an extreme departure from the standards of ordinary care to the extent that the

danger was either known to the defendant or so obvious that the defendant must have been aware

of it."  *Kalnit*, 264 F.3d at 142 (internal quotation omitted).  "'[S]ecurities fraud claims typically

have sufficed to state a claim based on recklessness when they have specifically alleged

defendants' knowledge of facts or access to information contradicting their public statements.'"

*Id.* (quoting *Novak*, 216 F.3d at 308).

Plaintiffs offer an array of arguments regarding circumstantial evidence of conscious misbehavior or recklessness.  These arguments generally fall into two categories: (1) that E*Trade knew or had access to information that ARS were not the same as cash or money markets when its financial advisors were telling customers otherwise, and (2) that E*Trade knew or had access to information that the market for ARS risked total failure, yet it created the misimpression of continued growth and liquidity.

    i.      Circumstantial Evidence That ARS Were Not the Same as Cash or Money Market Funds

Plaintiffs first contend that E*Trade, as a self-described financial expert, knew or had access to information no later than March 2005 confirming that ARS were not cash equivalents or short-term investments.  (Pls.' Opp. at 12-13.)  In support of this argument, plaintiffs allege that the "Big-4" accounting firms, the FASB, and the SEC had by that time adopted the position that ARS "do not qualify as 'cash equivalents.'"  (SAC ¶ 59.)  Although plaintiffs do not allege that E*Trade's financial statements violated any accounting rules, plaintiffs do suggest that E*Trade's representations to its customers—which purportedly likened ARS to cash and other short-term, liquid securities—specifically conflicted with the SEC's interpretation of FASB Statement No. 95.  However, this FASB rule deals with the definition and *accounting* treatment of cash flows, not the *marketing* practices for cash or its equivalents.  E*Trade's purported knowledge of an accounting rule is insufficient to establish scienter with respect to statements made in the context of marketing ARS.  *See Vining*, 2010 WL 3825722 at *11-12.[2]

Plaintiffs further contend that E*Trade knew ARS were not the equivalent of money market funds because an E*Trade manual addressing the obligations of its "financial advisors"

---

[2] Even if plaintiffs had asserted that defendants had violated specific accounting rules, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," *Novak*, 216 F.3d at 309; *see Vining*, 2010 WL 3825722 at *12 n.2.

provided that "[i]t is imperative that you fully explain the differences between an ARP [auction rate preferred] and a Money Market."  (SAC ¶ 92.)  The manual's existence does raise an inference that E*Trade knew that at least ARP (a type of ARS) had notable differences from money markets, notwithstanding the financial advisors' alleged representations to the contrary.  The strength of this inference, however, is severely limited by the fact that plaintiffs do not specify who wrote the manual, who received the manual, who read the manual, when the manual was issued, or the context of the "single relevant sentence on auction rate securities."  (*Id.* ¶ 92.)

The SAC is also rife with inconsistencies regarding what E*Trade's "financial advisors"[3] did or did not know about ARS:  As noted above, E*Trade's "Policies and Procedures Manual" allegedly instructed its financial advisors to "explain the differences" between ARS and money markets.  (*Id.* ¶ 92.)  Yet at the same time, "E*Trade failed to provide sufficient training [regarding ARS] to its financial advisors during the Class Period," (*id.* ¶ 91), and "[a]s a result, E*Trade's financial advisors lacked a rudimentary understanding about how the auction rate securities market function during the Class Period," (*id.* ¶ 96).  These allegations give rise to competing inferences about the scienter of E*Trade's financial advisors: it is plausible that the financial advisors knew, because of the Policies and Procedures Manual, that they were misrepresenting ARS to customers; it is also plausible that, because of inadequate training, they "lacked a rudimentary understanding" of ARS and therefore had no idea they were making misrepresentations to customers, (*id.* ¶ 96).  In light of the SAC's internal contradictions and lack of specificity as to which financial advisors knew what and when, the Court cannot draw a sufficiently strong inference that this class of E*Trade employees acted with culpable, as

---

[3] Throughout the SAC plaintiffs refer generally to E*Trade's "financial advisors" as the people who sold ARS.  However, plaintiffs do not or identify any specific individual as a financial advisor.  In allegations regarding the particular experiences of named plaintiffs, the SAC refers to two E*Trade "financial brokers," Gibson and Welthaus.  It is unclear whether these "financial brokers" are also "financial advisors" as the latter term is used in the SAC.

opposed to nonculpable, intent.  *See Tellabs*, 551 U.S. at 326 (noting that "omissions and ambiguities count against inferring scienter").

To the extent plaintiffs argue that E*Trade deliberately or recklessly failed to provide sufficient training to its financial advisors, the SAC lacks particularity.  Plaintiffs do not specify who within "E*Trade's management" delegated training to other broker-dealers, why training should not have been delegated to other broker-dealers, when training did or did not take place, and who did or did not receive whatever training took place.  Plaintiffs' conclusory allegations of corporate scienter based on inadequate training of financial advisors cannot satisfy the heightened pleading standards of the PSLRA.  *See Vining*, 2010 WL 3825722 at *13; *Defer*, 2010 WL 3452387 at *5.

ii.      Circumstantial Evidence that the ARS Market Risked Failure

Plaintiffs want the Court to draw an inference that E*Trade knew or was reckless in not knowing that the ARS market depended on auction dealers' interventions in order to maintain the illusion of liquidity.  Although plaintiffs suggest that E*Trade's "substantial participation" in the ARS market, (SAC ¶ 58), afforded some special access to information, the fact that E*Trade did not issue ARS or actually place support bids or function as an auction dealer weakens such an inference.  The single, conclusory allegation that E*Trade provided "liquidity between auctions by purchasing the customer's ARS and moving the ARS into E*Trade's own error account" or by selling these ARS to other customers, (SAC ¶ 114), is insufficient to demonstrate that E*Trade had scienter with respect to the practice of others—namely, auction dealers—of placing support bids.  Plaintiffs not only fail to allege with particularity how E*Trade knew or had access to information about whether other companies placed support bids, but they also fail to

allege with particularity how E*Trade knew or had access to information that auctions would fail absent these interventions.

Next, plaintiffs argue that by August 2007 E*Trade knew or was reckless in not knowing that ARS auctions were actually beginning to fail. Yet plaintiffs do not allege who knew or had access to information that ARS auctions had failed, or how this information was known or recklessly not known. The SAC simply asserts that "these failures were known to companies involved in the auction rate securities market." (SAC ¶ 41.) The Court cannot make a strong inference that E*Trade knew or was reckless in not knowing that ARS auctions were beginning to fail by August 2007 simply on the basis that E*Trade bought and sold ARS.

Assuming *arguendo* that E*Trade knew by August 2007 that ARS auctions were beginning to fail, plaintiffs still cannot establish that E*Trade acted with the requisite scienter. Plaintiffs focus the Court's attention on the email E*Trade sent to customers in "Summer 2007" stating that "[t]he ARS market continues to experience tremendous growth and our electronic trading platform will further fulfill accelerated supply and demand for this currently under-serviced asset class." (SAC ¶ 75.) This statement allegedly contradicted facts available to E*Trade at the time. However, allegations in the SAC raise a competing inference that E*Trade believed the statement to be true at the time it was made. (*See, e.g.*, *id.* ¶ 30) (discussing "dramatic growth" in the ARS market, particularly in the twenty-six months between the end of 2005 and February 2008). The SAC's vague dating of this email ("Summer 2007") also raises an inference that E*Trade may have sent it prior to August 2007, the date plaintiffs allege that ARS auctions—after years of growth—faltered for the first time. Thus, the inference that E*Trade acted with scienter in sending this message is not at least as compelling as opposing inferences. *See Tellabs*, 551 U.S. at 323-24; *see also Defer*, 2010 WL 3452387 at *6 (noting that

to establish scienter the existence of "red flags" must be contemporaneous with contradictory statements).[4]

Moreover, E*Trade's purported knowledge that one or more ARS auctions had in fact failed does not create a strong inference that E*Trade knew or was reckless with regard to the fact that the market for ARS would totally collapse. Plaintiffs allege that the ARS market had existed for over twenty years with auction dealers following "uniform policies of placing support bids in auctions as necessary to prevent auction failures." (SAC ¶ 41.) By plaintiffs' own admission, the initial market failures in the latter half of 2007 were both unprecedented and limited in number, (*id.*); and the ultimate market collapse on February 13, 2008 happened "abruptly," (*id.* ¶ 8). *See also Vining*, 2010 WL 3825722 at *9, *14 (showing how nearly identical allegations to those made by plaintiffs cut against an inference of scienter). These allegations do not raise a strong inference that E*Trade knew or was reckless in not knowing that the ARS market would collapse and ARS holders would be unable to liquidate their securities.

Plaintiffs also want the Court to draw an inference of scienter from public statements by E*Trade Financial executives in fall 2007 about general turmoil in the credit markets and the downgrading of AAA-rated securities, (SAC ¶¶ 63-70). The problem is that these statements simply do not concern ARS. Even if the Court views these statements together with E*Trade's alleged knowledge of isolated ARS auction failures, the SAC still does not give rise to a comparatively strong inference that either defendant knew or was reckless in not knowing—as opposed to merely negligent in not anticipating—that an unprecedented collapse would occur in the ARS market. *See Vining*, 2010 WL 3825722 at *13-14 (inference that defendant ARS

---

[4] Plaintiffs point out with respect to this email that "[a] duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event," *In re Int'l Bus. Machs.*, 163 F.3d at 110. Although it is undisputed that E*Trade never provided any update or correction to this email, the Court does not need to address whether E*Trade breached such a duty because the SAC does not contain allegations that any plaintiff actually received this email or relied on it in purchasing ARS. *See id.*

sellers were negligent in not predicting collapse of ARS market more compelling than inference that sellers acted fraudulently); *In re Citigroup*, 700 F. Supp. 2d. at 305 (inference that defendants "only engaged in bad (in hindsight) business judgments in connection with ARS, and did not engage in the alleged conduct with an intent to deceive investors" compelling); *cf. Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events . . . do not suffice to make out a claim of securities fraud.").[5]

### c.  Competing Inferences

The Court is mindful of its obligation to review "all allegations holistically" and evaluate competing inferences.  *Tellabs*, 551 U.S. at 326; *see also Matrixx Initiatives, Inc. v. Siracusano*, No. 09-1156, slip op. at 20, 2011 WL 977060, at *13 (U.S. Mar. 22, 2011).  Assessing plaintiffs' allegations collectively, the SAC can be read to raise opposing inferences with respect to E*Trade's state of mind.  A plausible inference that E*Trade acted with the requisite scienter is supported by the alleged facts that accounting rules treated ARS differently from cash, that E*Trade maintained a manual emphasizing the distinction between ARS and money markets, that E*Trade participated in the ARS market during the Class Period, and that E*Trade Financial's executives were aware of problems in the credit markets by fall 2007.

Nevertheless, the SAC can also be read to raise a plausible, competing inference that E*Trade did not have fraudulent intent, but rather was merely negligent in its failure to provide employees with sufficient training or to predict the demise of the ARS market.  This inference of negligence is particularly compelling in light of: (1) the unprecedented and sudden collapse of

---

[5] Additionally, plaintiffs dwell on the fact that E*Trade has acknowledged that its marketing tactics and conduct in the ARS market became the subject of government investigations beginning in August 2008.  (SAC ¶ 120.)  For example, an administrative petition filed by the North Carolina Securities Division charges that "customers of [E*Trade ], when solicited to purchase ARS products or when inquiring on their own about ARS products, did not receive truthful, accurate or complete information from [E*Trade]."  (SAC ¶ 123.)  Simply put, the mere existence of allegations, without any determination of liability, does not support an inference of scienter.  *See, e.g.*, *City of Austin Police Retirement System v. ITT Educational Servs., Inc.*, 388 F.Supp.2d 932, 942 (S.D.Ind. 2005).

the ARS market in February 2008 after what is alleged to be more than twenty years of sustained

liquidity and growth, and (2) E*Trade's relatively limited role in the ARS market as a retailer,

not an issuer, underwriter, or auction dealer.  Accordingly, the Court "finds no reason to deem

[p]laintiffs' theory as plausible as the more cogent theory that [defendant] was caught off-guard

by the exceptional turmoil in the financial markets and did not consciously or recklessly defraud

investors."  *Vining*, 2010 WL 3825722 at *14.

      Moreover, although plaintiffs define the two defendant corporations separately—E*Trade

Financial Corporation is defined as "E*Trade Financial," (SAC ¶ 15), and E*Trade Securities

LLC is defined as "E*Trade," (*id.* ¶ 16), a convention used throughout this opinion—plaintiffs

nonetheless conflate the two entities at many points in the SAC, thus weakening any inference of

scienter.  For example, plaintiffs allege that specific E*Trade Financial executives held an

earnings call in October 2007 in which they acknowledged disruptions in the credit market and

the downgrading of particular securities owned by E*Trade Financial.  (*Id.* ¶¶ 62-63.)  Yet based

on these and other factual allegations regarding *E*Trade Financial*, plaintiffs assert that

"*E*Trade* knew the foundations for the ARS market were collapsing," (*id.* ¶ 61 (emphasis

added)), and *E*Trade* "internally downgrad[ed] its own AAA-rated investments," (*id.* ¶ 70; *see

also* ¶ 204).  The scienter of E*Trade Financial, a parent, is not automatically attributed to

E*Trade, a subsidiary.  *See Defer*, 2010 WL 3452387 at *8; *In re Parmalat Sec. Litig.*, 377

F.Supp.2d 390, 406 (S.D.N.Y. 2005).  Additionally, plaintiffs are not always clear who works for

whom: while the SAC repeatedly refers to unnamed E*Trade "financial advisors," suggesting

that they are agents of E*Trade in particular, this impression is muddied by broad allegations

such as the allegation that "E*Trade Financial and E*Trade management failed to supervise their

financial advisors." (*Id.* ¶ 94.)  Failure "to allege facts that particularize how and why *each*

defendant" had scienter only compounds the SAC's inadequacy.  *See Defer*, 654 F. Supp. 2d at 217; *see also Tellabs*, 551 U.S. at 326 (noting that "omissions and ambiguities count against inferring scienter").

The competing inferences here are insufficient to satisfy the Supreme Court's requirement that an inference of scienter be "at least as compelling" as the competing inference; i.e., that it be a "strong" inference.  *Id.* at 323-24.  Because plaintiffs have not alleged facts showing motive and opportunity or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness on the part of E*Trade, they have not established the strong inference of scienter required by the PSLRA.  Accordingly, plaintiffs fail to allege a violation of Section 10(b) and Rule 10b-5.

C. <u>Section 20(a) Claims</u>

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud.  *See* 15 U.S.C. § 78t(a).  "The statutory language identifies two components to a control person claim: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant."  *Catton v. Def. Tech. Sys.*, 457 F. Supp. 2d 374, 382 (S.D.N.Y. 2006) (quotation and citation omitted).  In the absence of a primary violation, a plaintiff cannot establish control person liability.  *See ATSI Commc'ns.*, 493 F.3d at 108 ("[Plaintiff] fails to allege any primary violation; thus, it cannot establish control person liability.").

Because plaintiffs here have not alleged a primary violation of Section 10(b) and Rule 10b-5, they also have not established control person liability pursuant to Section 20(a).

### III.   CONCLUSION

Plaintiffs have not alleged facts supporting the strong inference of scienter required by extensive Supreme Court and Second Circuit authority in order to state a claim for relief pursuant to Section 10(b) and Rule 10b-5.  Accordingly, defendants' motion is granted in its entirety and the second amended complaint is dismissed with prejudice.

Dated: New York, New York
        March 31, 2011

SO ORDERED:

Sidney H. Stein, U.S.D.J.